***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner as to plaintiff's entitlement to indemnity benefits after April 11, 2007, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The employee/employer relationship existed at the time of the injury.
2. Defendant-Employer was insured by Key Risk Insurance Co. at the time of the injury. *Page 2 
3. The date of the injury was July 24, 2004.
4. The parties were subject to the North Carolina Workers' Compensation Act at the time of the injury, defendant-employer employing the requisite number of employees to be bound under the provisions of the Act.
5. Defendants admitted plaintiff's injury as compensable by Form 60 dated August 6, 2004.
6. Plaintiff's average weekly wage is $730.38, yielding a compensation rate of $486.94.
7. The following documents were accepted into evidence as stipulated exhibits:
 a. Exhibit 1: Executed Pre-Trial Agreement
 b. Exhibit 2: Plaintiff's medical records
 c. Exhibit 3: Nurse case manager reports
 d. Exhibit 4: Correspondence between counsels
 e. Exhibit 5: Industrial Commission Forms
 f. Exhibit 6: Industrial Commission filings
 g. Exhibit 7: Industrial Commission Orders
8. The following was accepted into evidence as defendants' exhibit:
 a. Exhibit 1: Videotape of surveillance footage
9. Transcripts of depositions of the following were also received post-hearing:
 a. Dr. Karen Jones
 b. Dr. Scott S. Sanitate (with Exhibit 1)
 *********** *Page 3 
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the evidentiary hearing, plaintiff was 42 years old and is a high school graduate. He worked for defendant-employer at a Precision Tune Auto Care store in Fayetteville as a service technician. Prior to working for defendant-employer, plaintiff worked another auto mechanic job.
2. On July 24, 2004, plaintiff was working on a vehicle when it began to move. Plaintiff tried to reach into the vehicle to cut the engine, and, as he did so, the left front tire rolled over his left leg and foot. Plaintiff sustained a complex fracture of his tibia and fibula and a crush injury of his left foot.
3. That same day, plaintiff underwent an open reduction-internal fixation procedure with plate placement with Dr. Karen Jones.
4. Plaintiff continued to treat with Dr. Jones and underwent physical therapy. His left foot pain worsened.
5. In January of 2005, Dr. Jones' physician's assistant ordered nerve conduction velocity testing on plaintiff's left foot. The testing, done on January 12, 2005, found a peroneal nerve lesion. On February 2, 2005, Dr. Jones' physician's assistant noted that plaintiff had plateaued and had thus been discharged from physical therapy.
6. Plaintiff underwent a Functional Capacity Evaluation (hereinafter "FCE"). The FCE results showed plaintiff could do moderately heavy work but that he could not stand for long periods. Plaintiff was assigned restrictions of no prolonged walking, standing or crawling greater than 30 minutes without a 15-minute break, and also no ladder climbing. *Page 4 
7. In April of 2005, plaintiff attempted a return to work in his former position. After six days, plaintiff's pain and swelling in his left foot forced him to stop working. During this unsuccessful trial return to work, plaintiff worked 10-hour shifts and was on his feet a great deal. When he stopped work, his symptoms significantly improved. Because of the increased pain, Dr. Jones wrote plaintiff back out of work on May 2, 2005, and she diagnosed a localized neuropathy in plaintiff's left lower extremity. She suggested that plaintiff try limited hours in his regular duty, with a ramp-up of four hours per day for the first two weeks, six hours per day for one week, and then a return to his full shift.
8. Plaintiff did not return to work again after the failed trial in April of 2005.
9. On June 2, 2005, plaintiff saw Dr. Brian Szura for an orthopedic evaluation. Dr. Szura diagnosed a crush injury to the left foot with resultant neuropraxia, an injury to the deep peroneal nerve, and possible regional pain syndrome. He agreed with Dr. Jones that plaintiff was "unlikely . . . to regain significant function in the deep peroneal distribution." Dr. Szura believed that plaintiff had a chronic pain problem and he ordered a bone scan to rule out regional pain syndrome.
10. Plaintiff underwent the bone scan on June 15, 2005. The findings were consistent with post-traumatic and/or early degenerative changes in the left foot, with probable degenerative and/or inflammatory arthropathy affecting the first metatarsal-phalangeal joint bilaterally.
11. On June 23, 2005, plaintiff followed up with Dr. Szura, who noted that the bone scan did not suggest regional pain syndrome. Dr. Szura thought plaintiff's pain was neurogenic in nature, and he referred plaintiff to Dr. Scott Sanitate, a physiatrist, for pain management. He also released plaintiff to return to limited duty with a total of three to four hours per day of *Page 5 
standing, sitting breaks every 30 minutes as necessary, no ladder climbing and no lifting over 35 pounds.
12. Plaintiff had his first visit with Dr. Sanitate on July 11, 2005. Dr. Sanitate noted that plaintiff's pain was aggravated with prolonged standing or walking. He also noted that plaintiff was cooperative in the examination and showed no signs of symptom magnification. Dr. Sanitate diagnosed chronic distal left lower extremity pain with underlying peroneal trauma, EDB atrophy and decreased left toe extension. He suggested that plaintiff use a cane for long-distance walking, and he prescribed medications and a trial of a TENS unit. He also assigned restrictions of no lifting over 10 pounds, limited stair climbing and frequent position changes as needed.
13. Plaintiff continued to treat with Dr. Sanitate. On November 14, 2005, Dr. Sanitate wrote that he had no further treatment options to offer plaintiff and that he could return as needed. Dr. Sanitate assigned permanent restrictions of sedentary work only, frequent position changes and no lifting over 10 pounds.
14. On February 2, 2006, Dr. Sanitate assigned a 25 % permanent partial impairment rating to plaintiff's left lower extremity.
15. On the February 2, 2006 visit, Dr. Sanitate also reviewed a job description for a "service writer/advisor" position with defendant-employer. According to the job description, the position involves customer service, with the employee being "the first point of contact with customers both on the phone and in person" and "act[ing] as liaison between the customer and the services that [defendant-employer] offers, coordinating the flow of information and ensuring good customer service." Plaintiff expressed his concerns at the appointment regarding his lack of computer skills, his inability to operate a clutch on a manual transmission (the job description *Page 6 
calls for the employee to "assist shop flow by moving vehicles in and out of service bays"), and his trouble with wearing a shoe for more than an hour because of discomfort.
16. At the February 2, 2006 visit, defendants' nurse case manager, Mary Anne Peterson, presented the job description to Dr. Sanitate and noted the concerns that plaintiff himself expressed verbally at the appointment. Additionally, Ms. Peterson presented to Dr. Sanitate the January 31, 2006 letter that plaintiff's counsel had presented to her under the Commission's Rehabilitation Rules. In that letter, plaintiff's counsel pointed out that the job description is silent as to the amount of standing and walking that is required in the position and he noted that some of the duties appear non-sedentary in nature, with prolonged standing required.
17. Dr. Sanitate approved the job description as being within plaintiff's physical abilities.
18. Defendant-employer wrote to plaintiff on February 9, 2006, offering him the service writer/advisor position to start on February 20. The position guaranteed five full days per week starting at $10 per hour, plus overtime when applicable, with a weekly bonus of one percent of the store's sales should they exceed $12,000 for the week. Plaintiff did not accept the position.
19. On November 20, 2006, defendants filed a Form 24 Application, seeking to suspend plaintiff's indemnity compensation for his refusal to accept the February job offer. Special Deputy Commissioner Christopher B. Rawls disapproved the application by Order filed December 29, 2006, on grounds that the job description did not adequately describe the physical requirements of the position and that the documented pay scale was not comparable to plaintiff's pre-injury average weekly wage. *Page 7 
20. Defendants offered plaintiff the service writer/advisor position again on or about January 15, 2007. Plaintiff again refused the position on the same grounds as before even though defendants, through their counsel, ensured plaintiff that much of the work of the position could be performed while seated on a stool, addressing plaintiff's concerns of prolonged standing.
21. On January 24, 2007, defendants filed a second Form 24 Application, this time including a chart showing the amount plaintiff would have earned as a service writer/advisor in the year preceding his injury vis-a-vis what plaintiff actually earned as a service technician during that period. The calculations were based on a 49-hour work-week and the store's sales during that period. The average pay for the service writer/advisor position was figured as $670.88 per week. Plaintiff contended that the position was make-work, alleging that no one had been a full-time service writer/advisor at plaintiff's store. Special Deputy Commissioner Rawls referred the matter for a full evidentiary hearing.
22. On April 11, 2007, defendants sent plaintiff back to Dr. Sanitate for clarification of plaintiff's work restrictions and again review the job description. Ms. Peterson and a representative from plaintiff's counsel's law firm attended the evaluation with plaintiff to ensure that all of plaintiff's concerns regarding the job, including his concerns regarding prolonged standing and walking, were presented to and addressed by Dr. Sanitate. Dr. Sanitate noted left lower extremity atrophy and he left in place the restrictions of sedentary work only, frequent position changes and no lifting over 10 pounds. He further noted that any job requiring long distance walking, crawling or kneeling was ill-advised, that infrequent use of a clutch was not contraindicated, and that plaintiff should be allowed position changes as needed. Dr. Sanitate reviewed and approved the job description a second time.
23. Defendants also obtained surveillance of plaintiff on *Page 8 
April 11 and 12, 2007. On April 11, plaintiff walked out of Dr. Sanitate's office, following his appointment, with a pronounced limp and using his cane in his right hand. Minutes later, he pumped gas with a slight limp. Later in the day, plaintiff walked into a Home Depot with a slight limp, and, upon leaving the store, he helped another man load a large box into the back of a pickup truck. On April 12, plaintiff walked into a Food Lion and a Family Dollar with a minimal limp, and he later unloaded the groceries at his home, holding all the groceries (with a total weight that appeared to exceed ten pounds) with his right hand. The surveillance footage totaled about 30 minutes.
24. When shown the surveillance footage, Dr. Sanitate indicated that he might increase plaintiff's lifting restriction to 25 to 40 pounds, but the footage did not seem to surprise Dr. Sanitate as to plaintiff's ability to walk.
25. The last full-time service writer/advisor who had worked at plaintiff's store was John Linton, who had worked there about a year prior. Mr. Linton was paid $10 per hour plus a weekly bonus of one percent of the store's sales if the sales exceeded $12,500. Defendant-employer has offered this position to the general public in the past and there have been multiple service writers/advisors at the location where plaintiff worked.
26. On November 14, 2005, plaintiff was released to return to work by Dr. Sanitate with permanent sedentary to light duty work restrictions. No physician has taken plaintiff completely out of work since he was released by Dr. Sanitate.
27. Plaintiff continues to refuse the full-time service writer/advisor position offered by defendant-employer.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 9 
 CONCLUSIONS OF LAW
1. "If an injured employee refuses employment procured for him suitable to his capacity he shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Industrial Commission such refusal was justified." N.C. Gen. Stat. § 97-32. In the case at hand, plaintiff was offered suitable employment, which had been approved by his treating physician taking into account any concerns plaintiff had regarding the position, on April 11, 2007. Plaintiff's continued refusal of said employment thereafter was not justified. N.C. Gen. Stat. § 97-32.
2. Defendants are required to provide plaintiff with reasonably necessary medical treatment related to his compensable injury that tends of effect a cure provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, and 97-25.1.
 **********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants are entitled to suspend plaintiff's indemnity benefits as of April 11, 2007.
2. Defendants shall pay medical expenses resulting from plaintiff's compensable injury so long as it tends to effect cure, provide relief, or lessen plaintiff's disability.
3. Defendants shall pay the costs. As part of their costs, if they have not done so already, defendants shall pay an expert witness fee to each of the following providers, in the amount shown or the amount actually billed, whichever is less: $510.00 to Dr. Jones, and; $600.00 to Dr. Sanitate. *Page 10 
This the 13th day of May 2008.
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER